UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>DEANGELO THOMAS,<br><br>  Defendant. | Case No. 25-20285<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [23]**

Deangelo Thomas lured an individual to a residence in Detroit to sell him some clothing. Immediately after the transaction, as the buyer was leaving the residence, he was robbed and shot multiple times. After interviewing witnesses, watching surveillance video, and analyzing phone records and other data, law enforcement identified Thomas as a suspect in the robbery. Using the information gathered from the investigation, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives sought and obtained a search warrant for Thomas' residence and cell phone. In executing that warrant, agents seized Thomas' cell phone, which contained a video of him possessing firearms. Thomas was subsequently charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 17.)

Thomas does not believe the search warrant affidavit established probable cause that evidence of the robbery would be found in his residence or cell phone. So

he seeks to suppress the evidence seized from the search. (ECF No. 23.) The government, by contrast, contends that the "warrant was replete with evidence connecting Thomas to the robbery." (ECF No. 31, PageID.136.) The Court agrees. Thus, the motion to suppress is DENIED.

## I.

The focus of this motion is the August 1, 2024, affidavit of ATF Special Agent Sherri Reynolds in support of a warrant to search Deangelo Thomas' residence and cell phone for evidence related to an armed robbery several months earlier. Thus, the Court will endeavor to summarize the contents of that affidavit. (ECF No. 31-1.)

On February 9, 2024, at approximately 3:58 a.m., a victim with gunshot wounds to the face, leg, and wrist arrived in the emergency department of St. John Ascension Hospital in Detroit. (*Id.* at PageID.166.) He told officers from the Detroit Police Department that three black males, wearing all black clothing, attacked him after he left a residence at 20486 Hull Street (the "Hull Street Residence"). (*Id.* at PageID.167.) The men demanded his money. (*Id.*) When he refused, one of the assailants began to fight him and the other two shot him. (*Id.*) After being shot, the victim gave the men the $9,000 he was carrying. (*Id.*) Two of the men fled in a black Dodge Ram truck, but the victim did not know where the third assailant went. (*Id.*) Responding DPD officers observed blood and spent shell casings by the sidewalk in front of the Hull Street Residence. (*Id.* at PageID.168.)

During the subsequent investigation of the robbery, law enforcement learned that the Hull Street Residence and black Dodge Ram were associated with Anthony

McIntosh. (*Id.* at PageID.168, 170.) Neighbors indicated that Anthony's brother, Shawn McIntosh, also lived at the Residence. (*Id.* at PageID.169.) Both brothers have significant criminal records and Shawn was on a GPS tether at the time of the robbery. (*Id.* at PageID.170.) The Residence was also associated with narcotics activity. (*Id.* at PageID.162.)

After the victim stopped cooperating, the officers interviewed an "associate" of the victim, who told them that the victim went to the Hull Street Residence after receiving numerous phone calls from an individual known as "Bird" who had some stolen clothing he wanted to sell to the victim. (*Id.* at PageID.175–176.) The associate identified Deangelo Thomas as Bird. (*Id.*) Phone records corroborated that a cell phone number associated with Thomas had eight calls with the victim in the 2 hours leading up to the robbery (which occurred around 3:44 a.m.). (*Id.* at PageID.177.) There were also six calls between Thomas' phone and Shawn McIntosh's phone the hour beforehand. (*Id.*) And Shawn's tether data placed him at the Hull Street Residence at the time of the robbery. (*Id.* at PageID.162, 171.) Additionally, video footage captured Thomas' black SUV picking up Shawn McIntosh and circling the block of Hull Street prior to the victim's arrival. (*Id.* at PageID.163, 180.)

The associate told law enforcement that after the victim arrived, he went inside the Hull Street Residence with Thomas and Anthony McIntosh. (*Id.* at PageID.176.) After the victim purchased the clothing, the three men left the Residence together. (*Id.*) This account was corroborated by the Hull Street Residence's Ring doorbell camera, which captured the robbery and events prior to the robbery. The video

3

footage showed that, at 3:15 a.m., three unidentified individuals were in the rear of 20487 Hull Street, a burned-out vacant house directly across the street from the Hull Street Residence. (*Id.* at PageID.171, 180.) Data from Shawn McIntosh's tether placed him in this location between 3:00 a.m. and 3:43 a.m. after circling the block of the Hull Street Residence several times in Thomas' black SUV. (*Id.* at PageID.171.)

A little before 3:44 a.m., Thomas, Anthony McIntosh, and the victim exited the Residence together and walked toward their vehicles. (*Id.* at PageID.180.) Three individuals, two with visible firearms, then approached the victim's car, ordered him out, and demanded what he had. (*Id.*) At that time, according to the camera footage, Thomas looked back at the robbery while continuing to place bags in his vehicle. (*Id.* at PageID.181.) While the victim struggled with the individuals on the driver's side of his car, Shawn McIntosh approached the passenger side. (*Id.*) Shortly after, the two individuals with the firearms shot the victim. (*Id.*) Thomas fled in the black SUV, Anthony McIntosh fled in the black Dodge Ram, and the three assailants, including the two shooters, fled on foot. (*Id.*) Shawn McIntosh went through the victim's pockets and then fled on foot behind the vacant house. (*Id.*)

The victim was able to drive himself to the hospital. Video footage from multiple businesses along the route showed his car being followed by a black Dodge Ram similar to the one being driven by Anthony McIntosh. (*Id.* at PageID.172.) Additional surveillance footage obtained from another search warrant showed Shawn McIntosh on the porch of a nearby residence six minutes after the robbery. (*Id.* at PageID.162, 174.) He was in all black clothing counting a large amount of money.

4

(*Id.*) He then received a phone call from the phone associated with Thomas and, per the surveillance footage, told the caller that the victim was shot in the face but that they did not get the money. (*Id.* at pageID.162–163.) Several hours later, around 7:10 a.m., Thomas' phone called the victim at the hospital. (*Id.* at PageID.177.) The victim's mother was present (*id.*, at PageID.175, 177) and she heard her son ask the caller if he was calling to see if he "finished the job?" (*id.* at PageID.175).

Based on these facts and her training and experience, Agent Reynolds told a state court magistrate there was probable cause to believe that Thomas, Shawn, and Anthony, along with others, conspired to commit assault with intent to rob while armed in violation of Michigan law and that probable cause existed to search Thomas' residence for fruits, evidence, and instrumentalities of these crimes—including firearms, ammunition, and Thomas' cell phone. (*Id.* at PageID.166, 187, 191.) The warrant also sought to conduct a forensic examination of the cell phone. (*Id.* at PageID.165.)

ATF agents executed the search warrant on August 8, 2024. (ECF No. 31, PageID.135.) They seized a cell phone that contained a video recorded on July 15, 2024, allegedly depicting Thomas in possession of two firearms. (*Id.* at PageID.136; ECF No. 1, PageID.3–4.) That video is the basis of the underlying felon in possession charge. Thomas now seeks to suppress this evidence as fruit of an unlawful search. (ECF No. 23.) He "submits that the search warrant affidavit fails to establish that he participated in the robbery or that evidence of the robbery would be found in his residence or cell phone." (*Id.* at PageID.78.) But that is not a fair reading of the search

warrant affidavit or application of the low probable cause bar. Nor does it necessitate an evidentiary hearing. *See* E.D. Mich. LCrR 12; E.D. Mich. LR 7.1(f). Indeed, when the facts are not in dispute and the defendant's argument is "entirely legal in nature," an evidentiary hearing is not warranted. *United States v. Ickes*, 922 F.3d 708, 710 (6th Cir. 2019) (citing *United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006)). So the Court will address Thomas' motion without further argument.

## II.

Federal constitutional law applies to state warrants challenged in federal court. *United States v. Helton*, 35 F.4th 511, 517 (6th Cir. 2022). The Fourth Amendment mandates that warrants be issued only upon a showing of probable cause. U.S. Const. amend. IV. The Sixth Circuit has "long held that a probable-cause nexus must connect" the intended "place to be searched and the things to be seized." *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021) (cleaned up); *see also United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) ("There must . . . be a 'nexus between the place to be searched and the evidence sought.'"). In other words, "[t]here must be a fair probability that the specific place that officers want to search will contain the specific things that they are looking for." *Reed*, 993 F.3d at 447; *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (explaining that probable cause exists for a search warrant when "there is a fair probability that contraband or evidence of a crime will be found in a particular place").

Probable cause "is not a high bar to clear." *United States v. Christian*, 925 F.3d 305, 311 (6th Cir. 2019) (en banc) (citation modified). And this Court must afford

"great deference" when considering the issuing judge's probable cause determination. *Id*. at 311–12. Affording this deference, Agent Reynold's affidavit passes muster.

## A.

*Step one*: The affidavit clearly established probable cause that Thomas was involved in the robbery. As the government's brief accurately chronicled: in the hours before the robbery, Thomas had numerous calls with Shawn McIntosh and numerous calls with the victim to get him to the Hull Street Residence with money; Thomas picked up Shawn and circled the Residence before dropping Shawn at an abandoned house across from the Residence to join the other suspects; after the victim arrived, Thomas went into the Residence; a short time later, he left the Residence with the victim and Anthony McIntosh; Shawn and the other suspects immediately converged on the victim, attacked him, and stole his money; Thomas fled in his SUV; he then called, not the police, but Shawn McIntosh and had a discussion about the robbery and whether they got the money; when Thomas later called the victim at the hospital, the victim asked if he was calling to find out if he "finished the job?" (ECF No. 31, PageID.144–146.)

In sum, the search warrant affidavit established that Thomas lured the victim to the Hull Street Residence to engage in a transaction that involved bringing cash and helped coordinate with Shawn McIntosh to effectuate the robbery. (*Id*. at PageID.144.)

*Step two*: Given Thomas' likely involvement, there was probable cause to believe evidence of the robbery would be at his residence and on his phone. A few well-established principles guide this Court's analysis.

First, in cases involving a variety of suspected crimes, "an issuing judge may infer that a criminal suspect keeps the instrumentalities and fruits of his crime in his residence." *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008) (citing *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (opining that firearms used in a robbery are "likely to be kept in a suspect's residence")); *see also United States v. Cobb*, 397 F. App'x 128, 133 (6th Cir. 2010) (inferring nexus between defendant's residence and evidence of "the same clothing" and "the same gun" used across robberies where both the "clothing and gun likely would have been in [his] possession six weeks following the final robbery . . . either to hide or potentially use in a future robbery"). "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained." *United States v. Bland*, No. 18-20555, 2018 U.S. Dist. LEXIS 199111, at *4 (E.D. Mich Nov. 26, 2018). So, "[i]n normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime." *Id*.

Second, the Court "afford[s] considerable weight to the conclusion[s] of experienced law enforcement officers" on "where evidence of a crime is likely to be found." *Williams*, 544 F.3d at 686. Here, at the time she submitted the warrant

8

application, Senior Special Agent Reynolds had been employed with the ATF for about 15 years. (ECF No. 31-1, PageID.165.) She had significant training and experience in all aspects of investigating violent crimes. (*Id*. at PageID.166.) She was investigating at least six individuals for conspiracy to commit armed assault with intent to rob. (*Id*.) And several of the conspirators were known to have possessed and used firearms.

And third, the Court gives "great deference" to the issuing judge and asks "whether the issuing judge had a 'substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Sanders*, 106 F.4th 455, 461 (6th Cir. 2024) (quoting *Gates*, 462 U.S. at 236). Here, the doorbell camera on the Hull Street Residence captured Thomas watching the robbery, loading bags into his SUV, and then driving away. After, he remained in contact with at least Shawn McIntosh. Thus, in light of all of the facts connecting Thomas to the robbery, it was reasonable for the issuing magistrate to rely on Agent Reynolds' conclusion that there was a fair probability that evidence or instrumentalities of the crime, like a firearm, were likely to be found in Thomas' residence.

This was certainly true of Thomas' cell phone—which was the only evidence actually seized from his residence and thus the only evidence that could possibly be suppressed. (ECF No. 31, PageID.150.) In this day and age, common sense dictated that Thomas' cell phone would be found at his residence. So too did the GPS data obtained by investigating law enforcement officers. (ECF No. 31-1, PageID.182 (describing that one month of phone data established that, between 2 a.m. and 6 a.m.,

Thomas' phone was at his residence 77 percent of the time).) The warrant application supported that Thomas' phone was used during and as part of the offense. Calls were made to the victim in the hours before his arrival at the Hull Street Residence and after he was shot. And calls were made to Shawn McIntosh shortly before and immediately after the robbery. In other words, there was evidence in the supporting affidavit that Thomas' phone was used to facilitate the robbery and to communicate with the victim and co-conspirators. This established a sufficient nexus between Thomas' cell phone and the robbery. *See United States v. Sims*, 508 F. App'x 452, 460 (6th Cir. 2012) ("The only probable cause necessary [to secure a warrant for a cell phone] is that the phone itself is being used in connection with an offense or commonly used by someone committing the offense."); *United States v. Bass*, 785 F.3d 1043, 1049 (6th Cir. 2015) (finding a sufficient nexus where an affidavit stated that suspect used cell phones to communicate with co-conspirators and was using the particular phone when arrested).

The warrant also established "a fair probability" that "the phone's data '[would] aid in a particular' investigation and disclose evidence of criminal activity." *United States v. Rolling*, No. 23-1045, 2024 U.S. App. LEXIS 26433, at *7 (6th Cir. Oct. 17, 2024). Agent Reynolds explained that, based on her training and experience regarding the use of cell phones for criminal activity, she knew that "cellular telephones will often have information about the co-conspirators that are involved in the criminal activity." (ECF No. 31-1, PageID.184.) She also knew that "[i]ndividuals who conspire to commit criminal offenses with firearms, frequently use cell phones to

10

communicate with co-conspirators before, during, and after criminal exploits." (*Id.* at PageID.185.) Most cell phones, continued the Agent, "also include a global positioning system ('GPS') technology for determining the location of the device." (*Id.*) Thus, a fair probability existed that evidence of the planning, coordination, and aftermath of the robbery would be found on Thomas' phone—and that the phone was in the vicinity of the crime scene. (*See id.* at PageID.183 ("Given the victim's lack of cooperation and his use of his cellular phone to communicate with Deangelo THOMAS, and Deangelo THOMAS' communication with Shawn MCINTOSH within the hours before the robbery, Deangelo THOMAS' call log, address book, and text messages will assist in collecting evidence as to why he was at 20486 Hull Street in the early morning hours of February 9, 2024, what he did once at that location, who he met at that location, who he was communicating with, what they were communicating about, and other events that culminated with the robbery.")); s*ee also United States v. Peterson*, No. 23-1413, 2024 U.S. App. LEXIS 27729, at *12 (6th Cir. Oct. 30, 2024) (finding that a search warrant affidavit describing the coordination of multiple people and vehicles during and after a shooting permitted an inference that those individuals, including defendant, used cell phones to coordinate their illegal conduct, which permitted an inference that evidence of the crime could be found on defendant's cell phones); *Rolling*, 2024 U.S. App. LEXIS 26433, at *7 (finding that the district court made a reasonable inference that "a cell phone possessed during a robbery conducted with the aid of another individual will contain evidence related to that offense").

11

In sum, probable cause existed to support the issuance of a search warrant to seize and search Thomas' cell phone.

## B.

Thomas makes two arguments as to why he believes the search warrant affidavit failed to establish probable cause that his residence or cell phone would contain evidence of the robbery. Neither persuades.

First, Thomas contends that the information provided by the associate of the victim was inadequate and lacked corroboration. (ECF No. 23, PageID.75, 80–81.) This fails legally and factually.

A search warrant affidavit may be based on hearsay from a confidential informant so long as the "issuing judicial officer is reasonably assured that the informant [is] credible and the information reliable." *United States v. Grooms*, 566 F. App'x 485, 488 (6th Cir. 2014) (quoting *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000)). And when, as here, an informant is "known to the police" and "would be subject to prosecution for making a false report," his statements are given significant weight, especially when compared to tips given by an anonymous source. *United States v. Dyer*, 580 F.3d 386, 391 (6th Cir. 2009) (quoting *United States v. May*, 399 F.3d 817, 824–25 (6th Cir. 2005)). That is even more true when there is "substantial independent police corroboration." *Id.*; *see also United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005) ("[I]t has been the rare case in which the Sixth Circuit has found a search warrant based on an informant tip to be inadequate if the information has been corroborated to some degree." (emphasis omitted)).

The information provided by the associate of the victim was substantially corroborated by numerous pieces of evidence gathered by law enforcement. The associate mentioned the victim receiving numerous phone calls from "Bird." (ECF No. 31-1, PageID.176.) The associate identified Thomas from a photo array as "Bird." (*Id.*) And in calls recorded by the Michigan Department of Corrections, numerous inmates also referred to Thomas as "Bird." (*Id.* at PageID.178.) Further, Thomas' phone records confirmed numerous calls to the victim before the robbery. And the information the associate provided about Thomas' conduct on the day of the robbery was consistent with that captured on the Ring doorbell video. This corroboration enabled the issuing magistrate to conclude that the associate was reliable and to consider his/her information in the probable cause analysis.

Second, Thomas contends that the cell phone data and Ring video establish his mere presence at the Hull Street Residence before the robbery and not his participation in the robbery. (ECF No. 23, PageID.81.) This fails for the simple reason that when the Court reviews a warrant application for indicia of probable cause, it "read[s] the affidavit reasonably . . . holistically, examining the totality of the circumstances and employing a healthy dose of common sense." *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018) (omission in original) (quoting *United States v. White*, 874 F.3d 490, 502 (6th Cir. 2017)). Employing those techniques, the Court finds that the entirety of the affidavit did more than establish Thomas' mere presence. It demonstrated that Thomas enticed the victim to the scene of the crime.

13

He surveilled the area. He transported and engaged with one of the assailants and asked him about the taking of the money. And he did nothing to help the victim.

Again, probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Helton*, 35 F.4th at 517. Thomas' conduct in the hours before and after the robbery outside the Hull Street Residence, as detailed in Agent Reynolds' affidavit, established probable cause to seize his cell phone for evidence of that robbery. There is no basis to suppress the evidence from that phone.

## C.

One final reason solidifies this conclusion. Even if somehow the affidavit at issue was insufficient to establish probable cause, the exclusionary rule does "not bar the government's introduction of evidence obtained by police officers acting in objectively reasonable reliance on a search warrant that is subsequently invalidated." *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *United States v. Leon*, 468 U.S. 897, 918–921 (1984)). "[T]he relevant question is whether the officer reasonably believed that the warrant was properly issued, not whether probable cause existed in fact." *United States v. Hython*, 443 F.3d 480, 487 (6th Cir. 2006).

For all the reasons previously stated, this "is not a case in which a 'simple glance' at the warrant would reveal deficiencies glaring enough to make reliance on it unreasonable." *United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018) (quoting *United States v. Watson*, 498 F.3d 429, 432 (6th Cir. 2007)). Nor is the warrant "so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable." *United States v. Watkins*, 179 F.3d 489, 494 (6th Cir. 1999). "All in all, this was not the kind of 'deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights' that triggers suppression." *Castro*, 881 F.3d at 966 (citing *Davis v. United States*, 564 U.S. 229, 238 (2011)).

## III.

Accordingly, the Court finds that Thomas' cell phone and the information derived from the search of it should not be suppressed, as this evidence was obtained in reasonable, good-faith reliance on a search warrant that established probable cause. Thus, Thomas' motion to suppress (ECF No. 23) is DENIED.

IT IS SO ORDERED.

Dated: July 10, 2025

                        s/Laurie J. Michelson
                        LAURIE J. MICHELSON
                        United States District Judge